Case number 21-1167 et al. The Nasdaq Stock Market LLC et al. Petitioners versus Securities and Exchange Commission. Mr. Hungar for the petitioners, Ms. Hardin for the respondents. Mr. Hungar, good morning. Good morning, Your Honor, and may it please the court. Congress was very specific in defining the authority granted to the commission under Section 11a)(a)(3)(b). It specified who the commission can direct to act, self-regulatory organizations, how it can direct them to act jointly, what they can act jointly about, operating the national market system, and why SROs are the congressionally chosen recipients of this responsibility. Namely, because it involves matters as to which they share authority under the Exchange Act. Non-SROs are not mentioned because they're not included. They don't share authority under the Exchange Act, and so they have no place in this very specific statutory regime for those who do. And just to drive home the point, Congress also specified the very different role that it allocated to non-SROs. And what is that role? Advisory, as Congress said in Sections 11a)(a)(3)(a), and 11a)(d). Given this carefully calibrated and very specific statutory regime, there's simply no silence or gap for the agency to fill. When Congress authorized the commission to direct self-regulatory organizations to act jointly, it meant self-regulatory organizations, not anyone else with whom the commission might prefer to share the quasi-regulatory authority that Congress gave only to the SROs. This Court has repeatedly rejected similar overreaches by agencies in keeping with the expressio unius canon and the principle that when Congress vests an agency with a specific grant of authority, the agency can't infer a broader general grant from the SROs. And the order also does violence to the structure and purpose of the Act because it grants national market system operating authority to individuals who, unlike the SROs, have no shared authority under the Act and are therefore not subject to the SROs' statutory obligations to protect investors and the public interest. Nor are they subject to the commission's direct regulatory oversight and control the way the SROs are. It begs credulity to suggest that Congress intended to allow non-SROs to exercise this authority without having imposed on them the same regulatory obligations and regulatory oversight that applies to the SROs. Can I ask you a question regarding, I guess it's section 11a, let me just give the U.S. Code site because I always mess it up when I try to do it the other way. It's 78s subparagraph c regarding amendment by the commission of rules of self-regulatory organizations. I don't know if you are familiar with that statutory provision or have it handy, but it says that the commission may abrogate, add to, or delete, or amend essentially the rules of an SRO as the commission deems necessary or appropriate to ensure the fair administration of the SRO and also to conform its rules to requirements of this chapter, etc., etc. So let's suppose I agree with the, for the sake of this question, with your contention that only an SRO can administer the national market system. That might implicate the part of the challenge order that would permit a non-SRO to administer the CT data plan. But with respect to governance, why doesn't this statutory provision that I've mentioned give the commission authority to the extent that it deems it appropriate to involve a non-SRO in the governance of this aspect of an SRO's duties? A couple of responses, your honor. First of all, the commission did not cite section 19 of the exchange act 78s c as authority for what it did here. And of course, under Chenery, the commission's rule or order can't be defended on a ground it didn't rely on. But more fundamentally, that rule, that statute would have no application here because we're not talking about SRO rules. We're talking about joint action by the SROs, which by definition doesn't involve their own rules. It involves them coming together. That's the point of the plan and the operating committee is that it's separate and distinct from their own rules because it involves joint authority, which unless the commission approves the plan and authorizes them to proceed jointly, they can't do. And so the plan provisions are not individual SRO rules. They're separate requirements created by the commission's authority under rule 608, I believe, of the commission's rules. And so this provision, I don't think would have any application, even if the commission had cited it, which it didn't. And then fundamentally, and going back to my primary point, the section 11A, A3B is the only place in the exchange act where the commission is given the authority to direct anyone to act jointly. And it's a very specific authority. And it's the one that the commission relied on here. And of course, it only involves the SROs in the exercise of their shared authority, and therefore it can't apply to the SROs. Thank you. I thought that I saw that statute cited and relied on, but I take your point. Another provision that I wanted to ask you about, which is in, I guess, section 11A, it's the provisions regarding the National Market Advisory Board at subsection D. It seems to me that one way of reading this is that if you look at D2, it says that it shall be the responsibility of the advisory board to furnish its views on regulatory proposals made by the commission or any SRO concerning the establishment, operation, and regulation of the markets for securities. And then if you go to D3B, it says that the advisory board shall study whether there's the need for the establishment of a new SRO to administer the national market system. And if so, to recommend how this new SRO will, what relationship it will have to existing SROs. It seems to me that those provisions also strengthen your argument that the, only an SRO can administer these duties. But I didn't see that argument in your brief, and so I'm trying to understand, perhaps I missed it, whether I'm missing something. We agree, Your Honor. I believe we did argue, maybe we didn't get down into the, quite as granular as your question suggests, but we certainly argue in our brief and today that, among other provisions, 11A subsection D and the advisory nature of that role assigned to non-SROs confirms that Congress, it's not as if Congress didn't think about what non-SROs should do in connection with the national market system, it did. And it's thought about them making advisory contributions, including under 11A D3C, the advisory board shall consult with self-regulatory organizations. So there's an advisory role for non-SROs, it's just not exercising authority under the act role, which is what the commission has improperly tried to delegate to these individuals who aren't subject to the obligations that the SROs have under the exchange act and don't share the authority that the SROs have under the exchange act. I mean, this provision contemplates that if necessary, that a new SRO could be created that could be independent of the existing SROs to perform this function, right? I see your point. Yes. Yes, I agree with you. That's a great point. And I agree that's still further confirmation of the point that there are many mechanisms. Another mechanism available to the commission under section 11A A3C is it specifically encourages the commission to make recommendations to Congress if they think something about the existing statutory regime doesn't work given the way the markets have developed, but they can't just depart from the authorities that Congress gave them without going back to Congress for new authority. Mr. Hunger, I have two questions. The first one about the independent administrator. Are there any SROs that don't sell the proprietary data products and are also affiliated with another SRO that does sell those? In other words, could an SRO be the independent administrator? I don't think so. I'm not entirely sure about this, but I know it has been the case and I believe it is still the case that there is at least one, if not more, SROs exchanges that do not sell proprietary data, but I can't be entirely certain about that. And so if that's the case, which I believe has been the case and I think probably still is the case, then such an SRO could qualify as the independent administrator. The problem is there are only two administrators right now that have experience with this and both of them are affiliated with exchanges that do sell proprietary data, so the administrators that have all the experience and expertise are precluded by the commission's rule, which is what results in the imposition of the very substantial costs that the independent administrator requirement will impose on the markets. Right. And then the other question I have is the difference between 11A and the regulation. In the language, let's see here, it's A, B, it's the language we're talking about, by rule or order to authorize or require self-regulatory organizations. Then you get to the reg and it drops off required and simply says in three, and I'm looking at 608A3, self-regulatory organizations are authorized to act jointly and they lop off required. Should we read anything into that? Just add that discrepancy. I don't think so, Your Honor. I mean, obviously the statute allows the commission to authorize or require or both. Here they chose to authorize. I mean, I think as a practical matter, if you're a self-regulatory organization subject to the commission's oversight and control and the commission has developed a national market system and authorized you to play your role in participating in it, it's something of a directive, even if phrased as an authorization. But I don't know that it makes any difference as a statutory matter. From our perspective, the point about rule 608 that's most important is the fact that it simply confirms and drives home the fact that only the SROs are authorized to act jointly. The rule 608 is filled with references to the SROs and the plan sponsors, which is simply SROs under another name and the roles that they play exclusively with no reference whatsoever to any role being played or allowed to be played by the non-SROs in the governance of the plans. You don't see that that lack of the phrase or required to in any way would allow the SROs to say, well, we are authorized, but we're not going to do it. In other words, there's a difference between being authorized and being required to. I mean, so your honor, with respect to the plan, so the commission ordered the SROs to develop the CT plan at issue here and to propose it to the commission. And then the CT plan, if it is not set aside, which it should be, has directives and mandates and requirements for how the practical matter. And given the other obligations of Reg NMS and the obligations of the SROs to provide data to the SIPs and operate the SIPs and to provide that information to the market, I think as a practical matter, although framed as an authorization, it really works as a requirement. Okay. I have just a couple of follow-up questions. So under the statutory scheme, the securities information processor is defined in the statute, but it is not defined to be an SRO. Am I correct about that? Yes, the securities information processors, there are two of them and they are, they're not SROs, but they are affiliates of the NYSE and the NASDAQ respectively. So they're not bound by the national market system plan or anti-fraud provisions, et cetera, just like broker-dealers or other non-SROs aren't bound by those. I don't know. I mean, there are provisions, confidentiality provisions, conflict of interest provisions, a variety of provisions in the plan. And as affiliates of SROs, the obligations under the exchange act apply to SROs and their members and affiliates. So I believe, and certainly there are extensive obligations in the plans and in Reg NMS regarding how SIPs, securities information processors are to behave. And so they are subject to all those requirements. I can't cite you chapter and verse for those requirements, but they are, SIPs are clearly regulated entities expressly covered by numerous provisions of the regulations and the plans. Thank you. All right. Mr. Hunger, we'll give you a couple of minutes and reply. Ms. Good morning, your honor. And may it please the court, I'm Tracy Harden on behalf of the Securities and Exchange Commission. I think as we came clear in the arguments this morning, you know, the flaw in petitioner's challenge here is that they're misreading this particular subsection to perform a purpose that it's just, that's just not the work it's doing. They're improperly reading that section in isolation. And it becomes clear when you look at the entirety of section 11A that the work A3B is doing here is, as Mr. Hunger said, making clear the ability for SROs to act jointly when they otherwise couldn't. You understand that as a statutorily created agency, your agency has only those authorities given by Congress. What's your best statutory language that says the commission can do what they're doing here with respect to the acting jointly requirement? Your honor, I think the operative provision is 11AC, which is the provision which grants the commission authority and requires the commission to develop a regulatory system for the dissemination of market data. And as the commission explained, you know, in the proposing order, in the governance order, and in this order, the equity data plans we're talking about here were created to fulfill the obligations under 11C. And that provision expressly contemplates the involvement of other market participants in the dissemination of market data by funneling them through the regulatory system Congress directed the commission to set up. And actually the Senate report makes clear that these provisions were intended to bring within the commission's statutory jurisdiction any entity involved in the collection, processing, or which the petitioners are relying on here necessarily requires resort to other statutory provisions, right? Of course, it has to further the purposes of the directive in 11A. It expressly refers you back to there, which talks about the commission using its authority under the entirety of the Exchange Act. There'd be no reason to say that if Congress intended A3B to be the only authority. What do you see as the office of the acting jointly language? What's it in there for if petitioners are not correct that it was needed in order to allow them to act jointly and that without it you don't have any authority to deal with acting jointly? That is to say where it doesn't apply. Your Honor, the work it's doing is to allay antitrust concerns that otherwise would exist if SROs were to act jointly. And remember, right, the provision is not just talking about administration of the national market system as a whole. It talks about regulation, administration, or operation of any subsystem or facility thereof. The system Congress was setting up in 1975 was a system in which individual competing enterprises were to have to come together, act cooperatively, and sell a product on a mutually agreed upon price. That creates obvious antitrust concerns and in fact the legislative history indicates Congress was worried about that and the antitrust implications of exchange actions were in fact the subject of conversation in the courts at the time after the and so the work that is doing is clarifying the availability of that tool in the development of the market system but it doesn't specify, right, the particular subsystem or facility of the national market system that joint action is with respect to. For that you necessarily have to look to provisions in the regulatory scheme which govern the substance. Absent that language and I think I hear you just lurking in the background of what you're saying, would the SROs have a fear or danger of being in violation of antitrust provisions if they acted jointly? Absolutely, your honor, and certainly at the time the act was passed in 1975 that was very much an open question. You know, there have been some that may allow them to have sort of a stronger argument for an implied waiver of antitrust under the exchange act but that wasn't the case in 1975 and certainly there's specific discussion in the house hearings leading up to this bill about the need for this kind of provision. Is there any problem with respect to the non-SROs in that area today as to say if they're acting jointly with the SROs, is there any danger of accusation of antitrust violation on the part of those entities? I think there are factual and legal distinctions between sort of the participation of non-SROs and again, you know, we're also we're talking about representatives of varying categories of non-SROs unlike the exchanges, right? You're not talking about every broker dealer being a member of this operating committee, right? You're talking about two representing different categories whereas the exchanges in order for a consolidated data feed to exist, you necessarily need all of the exchanges. I do want to sort of address kind of one argument in this respect that the petitioners raised in their brief which is if congress was worried about antitrust and contemplated other market participants, why wouldn't they be listed in A3B? I think the answer to that question is very similar to what we've just been talking about, your honor, which is there was less legal or factual clarity that that was a risk with respect to non-SROs and there wasn't sort of a particular highlighted concern that was already sort of being discussed in the legislative history and in case law at the time. So I don't think that precludes our reading and I do think once you sort of recognize that A3B is serving that role and that in itself is indeterminate about the substance of the market facility we're talking about, you necessarily have to look to surrounding provisions including 11 cap AC which is specific to the market activity we're talking about here, right? Congress very specifically directed the commission to create a regulatory system to assure the prompt, accurate, reliable, and fair collection, processing, and dissemination of market data. As the commission said in this order, given changes in the market it is no longer clear that these equity data plans which were created to serve those purposes are effectively doing so and so that is why the commission stepped in here and made what is a measure of change. So why then did Congress in setting forth the duties of the terms of administration by SROs and proposed plans by SROs and if there is a need to have a new administrator then it should be an SRO. So I think a couple of things your honor. I do want to point out just as an aside that that provision actually you know Mr. Hungar said that SROs are consulted by that board but that provision also lists non-SROs being consulted by that board as entities that are interested in or likely to participate in the establishment, operation, and regulation of the national market system. It lists broker-dealers, it lists SIPs, it lists issuers, and investors. So again this is... That doesn't help you because it says interested in. So all of those non-SRO entities can be interested in but that doesn't mean that Congress contemplated that they would take a role in establishing or administering. A couple of things your honor. First I would say you know we're not arguing that the statute is clear at Chevron 1. What we're arguing is that there is ambiguity as to what whether Congress would have... But here's why I'm concerned that it's not ambiguous and it's not ambiguous against you because if you look at the national market advisory board language at D3B it says that the advisory board shall study the possible need for modifications of the scheme of self-regulation provided for in this chapter so as to adapt it to a national market system including the need for the establishment of a new self-regulatory organization to administer the national market system. That's very explicit language. So your honor I think what that shows right is in the 75 amendments Congress very specifically did not make a decision as to the precise manner in which the national market system was going to be structured right. This is something new in which it's asking existing industry players to come together and engage in this enterprise. Congress considered a number of different options right which is it being administered by some combination of the existing exchanges, broker-dealers, other market participants creating a new entity to administer it which would be this new self-regulatory organization that the advisory board looks to. But ultimately Congress said look commission here are your very specific goals. Here's the things your regulatory system has to advance within that sort of ballpark. You can't stray outside the ballpark but within that ballpark we're going to leave the operative decisions to you. One option on the table is creating this new kind of entity right this SRO. But the the very fact that this is set up for an advisory board to look at and consider doesn't show that you know Congress wasn't saying this is the right way to go. And ultimately why would Congress have that as the only option for the advisory board to consider unless Congress believed that it should be an SRO to administer this system? Because the other options are already embodied elsewhere in the statute, your honor. Which is where are they embodied in the statute? Because you mentioned subsection c but I think that the problem that you run into with it is that it mentions non-SROs but it also governs purchases and sales and other things beyond the dissemination and publication of market data. And in provision c1e for instance it says brokers and dealers have to input the data pursuant to the rules of the national market system because obviously the system can't work unless all of the people kind of using it in bidding and making offers input the data. So I don't really see how this particular subsection contemplates that Congress shows that Congress contemplated a non-SRO to administer the system. So I think there's two things right. One I would point out that H3B itself is not just about administration. Again it encompasses operation of facilities and subsystems and so for petitioners to be correct about their reading, Congress in the context of being concerned about market center domination of market data solved that problem by codifying SRO control down to the operation of facilities and subsystems to the exclusion of all others. I think that's pretty unlikely reading of that language. But to turn to your question about paragraph c right what this provision does is it funnels all of these entities listed sort of at the beginning of c1 through all of the rules listed that it directs the commission to promulgate right. And one set of those rules is to assure the prompt accurate reliable and fair collection processing distribution and publication of information with respect to market securities. And again you know reading this in juxtaposed against H3B which again has a clear alternative role to play here. I just don't think you get to clearly precluding other market participants and the commission's read of this is perfectly reasonable when you look to not only the language which indicates some contemplation right that other market participants would be involved not only in c but in Congress's findings and objectives for a1 but also if you look to the legislative history and the purpose of this statute right Congress or the Senate report explicitly says we intend to bring all entities involved in the commission's regulatory jurisdiction and we want to create a system that ensures the fair dissemination of this data which in a consolidated form is essentially a monopoly and we need that to work for other market participants. And we are concerned that that data is currently being dominated by market centers right given that purpose and history the would have you believe that Congress codified for all time their exclusive control over all facilities and mechanisms of the national market system and that's at the very least not clear given the indications in the text. Well Congress contemplated that that a new SRO that could be independent of any of those SROs could take over the responsibility right? Congress contemplated as I said a number of options it could have been the exclusive SRO control they're talking about it could have been joint activity between the SROs and non-SROs as the commission encompassed in this order or it could have been a new body altogether a new SRO but what Congress did was say markets are dynamic markets are ever-changing we are going to give the commission the tools to watch how the market develops and nudge it in the direction to develop to hit our findings and objectives right? This isn't a situation which the commission is charging in guns blazing sort of upending the system this is a measured change an incremental change from what was established in 2005 when these market participants were given an advisory role on the the NMS plan right? The move here is from an advisory role to a minority voting power and that is justified by the sort of fundamental changes that have occurred in the market most specifically right the shift of these exchanges that currently dominate the national market system plan from non-profit mutual organizations to for-profit companies that competing products and the consolidation of a number of the exchanges into these large exchange groups that then can dominate voting control on the operating committee and what the commission reasonably determined is that the combination of those factors and sort of the conflict of interest that exists because they sell these competing products necessitated at least a little more weight behind the vote of the advisory committee members and that's really all we're talking about here it's a very reasonable appropriate reaction within the balance of the statute and the system congress created. I mean I could agree with all of the kind of factual basis and I don't even think that there's much of a dispute about the factual basis that some of these other data systems are faster than the systems disseminating the core data and the conflict of interest etc etc. It may agree as a policy matter that what the commission you know is doing kind of makes perfect sense and as it is reasonable in that regard that's separate from whether the statute permits it. I mean you're essentially saying that even though congress explicitly created an advisory role we can read between the lines and say that role. And the best language you have for that is kind of the absence of exclusive in subsection a and this language in subsection c that encompasses kind of all parties kind of involved in the system. So your honor I do want to make clear one distinction between the advisory roles that are talked about in the statute and what we're discussing here with respect to the operating committee on an NMS plan right. The advisory role in this statute is about the market structure large and it's advice to the commission about market structure writ large. That's true both in d and in the other subfair got the petitioners point to which is a3a I believe which talks about advisory committees under the federal advisory committee act right. We're talking about advice to the commission about larger market structure issues. What we're talking about with respect to the operating committee of a national market system plan is a body that's making the day-to-day decisions about the operation of the consolidated data right where those provisions don't talk about who is making decisions about the day-to-day operation of the feed. And that's what the operating committee is doing here right. It's essentially sort of like a board of directors. I mean I understand that I'm just trying to make sure I'm let me make sure I understand your current argument. You're saying to me that the national markets advisory board is not authorized to speak to this issue. Is that your argument? I'm saying that that wasn't the purpose of that board right. The purpose of that can that board if it wants to make a recommendation to create a new SRO to perform the functions of the CTE board. So that board doesn't exist anymore right. It is a board that was created by the 75 act to make recommendations. It met it made recommendations and it has long since disbanded. So there are you know equity markets advisory committees that the commission has created under the federal advisory committee act. And that advisory committee actually explicitly recommended and supported governance reforms almost exactly like the ones the commission made in this order. And so to the extent there's a question about what those advisory committees believe is important the one that currently exists recommended these changes. But doesn't this unless I'm misreading this which I may be but doesn't section 11a have provision about creating other advisory boards other than this particular national market advisory board. That's what I'm talking about your honor. If you look at paragraph a3a just above sort of this paragraph we've been talking about here it allows the commission to create advisory committees under the federal advisory committee act. And there is a equity market structure advisory committee that the commission convened in 2015 to look at equity market structure issues precisely because of the sort of shifts in the market that prompted this order. And that advisory committee recommended many of these very same changes that the commission made in this order. And it did not believe there was an authority problem with making those changes. So I'm not and I think you know just sort of step back a minute and look at the larger statutory argument right. The fact that congress kind of set a floor and made clear that all market participants should be able to provide advice about how to engage in this joint enterprise doesn't mean that congress has precluded more roles. I think you know that's evidenced by the fact that as Mr. Hunger said right the statute even contemplates a consulting role for SROs with respect to the advisory board. So just because congress envisioned everybody involved in this having a say doesn't mean it precluded formalizing that say by votes on the operating committee of a national market system plan which by the way isn't even mentioned in the statute right. These plans grew up as a way for market participants to jointly comply with regulatory obligations based on other provisions in the act right. The CQ plan one of the first one of these data plans arose as a industry way of jointly complying with obligations under a market data rule that the commission promulgated under paragraph c here. So I think that I have a question regarding the independent administrator. Let's suppose it is it is an entity that is not an SRO. What rules and statutory provisions are going to apply to it? So I think first to sort of go back and clarify what the plan requires which is that the data products and so to to sort of circle back to Judge Henderson's question from earlier right. There are SROs that don't sell proprietary data products right now. There are some independent exchanges. Of course FINRA is an SRO and a participant in the plan but to get to your honors point in terms of what binds the administrator as is currently true right. The provisions of the plan govern the administrator's actions. Those include conflicts and confidentiality provisions but they also include sort of the policies and procedures of the plan and there's a few other sort of fail-safes there right which is rule 608 and rule 608d allows the commission to hear appeals from the action or failure to act of anyone in connection with a national market system plan and that could and so anyone can bring a claim to the commission under that provision and there's an adjudication where the commission looks at whether the action or failure to act was consistent with the terms of the plan and whether the terms of the plan are being applied consistent with public interest protection of investors fair and orderly markets sort of all the regular standards. So that process exists and then of course there's sort of the fundamental point that the SROs here maintain majority voting control a super majority voting control on the operating committee so they can control or preclude any action that by either the administrator or non-SRO members of the operating committee that they don't believe is consistent with the plan or other regulatory obligations and finally of course plan action runs through the commission for approval and it examines for consistency with the act the plan and other regulations. I know my time is up. Judge Wilkins have you had your questions? I don't have any further questions thank you. All right Judge Sintel. All right I do have one for you Miss Harden and that is let's assume that we think the addition of the non-SROs to this CT plan and operating committee is ultra vires. Your argument about severability is pretty sparse and I don't want to lengthen the argument anymore than we've already done but you do speak about the second requirement we're supposed to look at that is that the agency you say it can function sensibly and that's more or less a parroting of it but we've all listened to your expansive description of how the SEC wanted to open this whole thing up and including the non-SROs which was very important so without those I don't see that the first requirement that is did the agency intend to pass the legislation even without the non-SROs. I don't see how you can argue that it did in light of what you've already argued about its intent to expand participation but if you want to take a minute or two to respond. Yes your honor and I will try to be brief. We have talked at the heart of the petitioner challenge. The order itself and the government's order which preceded this also speak at length about the benefits of the exchange group voting allocation and the independent administrator. The logic of both of those provisions applies sort of irrespective of whether there are non-SRO members on the operating committee. I will say with respect the sort of augmented majority voting structure that is set up under the plan you know that that may be a situation in which a remand would be appropriate. We would argue a remand without vacater if the non-SRO participants are not on the operating committee just because of the way sort of the wording of the plan sort of envisions there being non-SRO members but I also want to point out that there's a number of parts of this plan that aren't challenged at all. Another sort of innovation in this plan is the combination of the existing three equity data plans into one. None of that is implicated by the logic and so we would argue that you know there is severability language in the order, there is severability language in the plan, the logic of these three things are separate beyond that the logic of the other provisions of the plan are not implicated here and so we think you know this may be the rare case in which remand without vacater is appropriate if what the court is doing is vindicating only a subset of petitioner's challenges. All right, thank you. Mr. Hunger, why don't you take two minutes? Thank you, your honor. Four brief points. I was taking severability first. In addition to the fact that this non-SRO voting mandate was a was a core goal of the commission and therefore if it is invalidated as it should be vacater is required it's simply not the case that the regime can function sensibly if that's invalidated because it becomes internally inconsistent. There are two different voting requirements for the operating committee's decisions, a majority vote requirement and a two-thirds vote requirement and there'd be no way to know which one governs once you throw the non-SROs out. The operating committee couldn't even do anything that the plan would have no leadership because it would be incapable of deciding even how to make decisions so for that reason as well vacater would be required even if only the non-SRO voting requirement is invalidated and for all the reasons stated in our brief the vote dilution provision is equally invalid. Second, counsel for the sec argues that the operative provision here is section 11ac. The commission did not even rely on 11ac as authority for the acting jointly mandate. It relied on 11a a3b and that's because 11a a3b is the only statutory provision that talks about acting jointly. 11ac doesn't say anything about conferring authority on anyone to exercise regulatory authority let alone on non-SROs. It talks about imposing mandates on the regulated community by the sec through rules. So yes, non-SROs are obligated to comply with regulations promulgated by the commission to the extent they apply to non-SROs. That hardly suggests that congress intended to give the commission the authority to delegate SRO authority to non-SROs where nowhere in the exchange act are non-SROs entitled to exercise such authority. The antitrust argument advanced by counsel is completely baseless. The only reference to antitrust concerns in the committee reports of the 1975 legislation have to do with the antitrust concerns about a single SRO's rules that could have antitrust implications for people operating in in a given exchange. It has nothing to do with acting jointly. There's not a shred of evidence in the legislative history that congress had any concern about antitrust when it was acting jointly. Suppose we're looking at the language of the statute without looking at the legislative history. Is it not a susceptible of the interpretation that by giving them permission to act jointly this is a protection against possible antitrust liability? Remember, some of us don't look at legislative history very much. But why isn't that a reasonable possibility for the statute? It's a possibility. We have no way of knowing. They certainly didn't say it. But it's a possibility that that was one consideration. But it's also simply a logical inference that when congress has granted authorities to individual SROs but it hasn't authorized them to act jointly, they don't have the authority to come together and act jointly regardless of the antitrust laws. And so congress wanted to exercise their regulatory authority jointly and it created this provision. But there's no reason to infer from that that it intended congress also to be able to do that for non-SROs who have no regulatory authority. And again, this the non-SROs that the if it's true, the statute say that a single SRO can propose a plan. I'm sorry your honor? Where if at all does it say that a SRO solely can propose a plan? Well, by definition, plans as as devised by the concept of national market system plans is a creation of the commission in its rules. And by definition, a plan is national SROs acting jointly. If you look at rule 608a, that's what a plan is. And in fact, so it's by definition, if you have a plan, it's because the commission has authorized SROs to act jointly through a plan. But the statute in section 6, that's 19f, and in section 19b authorizes SROs individually to adopt rules and imposes on them various regulatory authorities. So they have the authority to, for instance, to adopt rules concerning the dissemination of market information and coordinating the activities of persons involved in that activity individually pertaining to their own market information. The point of section 11a a3b is to give the commission the authority to permit them to act jointly, which the commission did through creating the rule 608, which allows national market system plans. So why isn't one way of reading this statute that to be, well, the independent administrator in the CT order has to be an SRO, can be either be an existing one, or a newly created one. And so we limit the order in that fashion, but we don't have to set it aside. And to the extent that the commission amended the governance by adding non-SROs to the operating committee, we we can interpret the statute to maybe speak clearly as to whether ultimately an SRO has to the ability to control by having a majority of the votes. It does so and doesn't run afoul then of the statutory scheme. So I think there are two questions there, Your Honor. With respect to the administrator point, I think your correct observation that section 11a d3b, if I'm getting my letters correctly, provides further evidence of the point that Congress intended the SROs and only the SROs to be involved in administering the national market system and therefore the national market plans. I think that's an excellent point, a valid point, and a further reason why the commission's independent administrator requirement is invalid. With respect to the second part of your question about non-SRO voting, the statute requires SROs to be able to act jointly under the current regime. The commission, by giving voting power and influence to non-SROs who Congress did not intend or authorize to exercise quasi-regulatory authority, has completely upset the regime that only SROs should be exercising this authority. If non-SROs have voting power and significant voting power, given that the SROs don't agree on many issues, that means that the non-SROs have the authority to essentially influence the decision-making, the regulatory decision-making by the SROs. The whole point of including them in the commission's view is that the commission thinks they will have the ability to change the way decisions are made by the committee. It's like the Supreme Court's decision in Aetna against Lavoie. Even one member of a three-judge panel, let alone a larger panel, has an influence on the decision-making process and in that sense is exercising authority. If that person has no right to exercise authority, the whole system needs to be set aside. The decisions cannot stand. In this or any other case, I'm with on a panel of three and the other two judges disagree with me and vote differently. I may have had an opportunity to influence the decision-making and I would have some input, but ultimately, those two judges are going to exercise the authority of the court. I can write a dissent, but as much as I might like that dissent to have some authority, it will have none. That's true, Your Honor, but in some cases, it might go the other way and you would be in the two-to-one majority. In that circumstance, your role would very much have been important and dispositive in the decision. The same is true here. Indeed, that's the intent of the regime. The commission expressly says, yes, the point of this regime is that the non-SROs should be able to join together with a minority of the SROs to make decisions and impose their will on the majority of the SROs. The commission is intending and envisioning that the non-SROs will play a dispositive role in decision-making. That is clearly the exercise of regulatory authority in a way that Congress did not envision. The commission's reliance on 11AC simply proves the point, even though the commission and the order didn't rely on it and therefore can't rely on it as a basis for trying to save its order from invalidation. 11AC makes clear that the non-SROs are the targets of regulatory authority, not the exercisers of it. It would be extraordinary to think that an agency can take regulatory authority that's been granted to one set of entities and give it to someone else when Congress determined that the people that the agency wants to give that authority to were not to be the people exercising regulatory authority, but the people subject to regulatory authority. It's incongruous. The commission doesn't identify a single case in the history of administrative law where an agency has acted in that way without congressional authorization, and this should not be the first such case. All right. Any more questions? No. All right. Thank you, Vin. Madam Clerk, if you would call the next case.
judges: Henderson, Wilkins, Sentelle